KEMP *v.* STRADLEY.[1]

1. MUNICIPAL CORPORATIONS—BUILDING AND LEASING WHARVES—ENDS OF STREETS.

> Under the charter of Sault Ste. Marie, authorizing the city to establish, construct, maintain, and control public wharves on any lands on the shore of the St. Mary's river not the property of any individual, and lease the wharfing, the city may lease the land and authorize the lessee to build a wharf upon the bank of the river at the end of a street.

2. SAME.

> A wharf built at the end of a street, under a charter authorizing the city to construct and lease it in such a manner as to preserve the right of all persons to a free passage over the same with their baggage, is not a part of the highway, but may be used as other wharves, except that it must be open to public use, as provided in the charter.

Appeal from Chippewa; Steere, J. Submitted December 5, 1902. (Docket No. 152.) Decided November 9, 1903.

Bill by George Kemp against John G. Stradley, mayor, Harry A. Harrison, recorder, and the city council, of the city of Sault Ste. Marie, and the Trans-St. Mary's Traction Company, to restrain the construction of a dock. From a decree dismissing the bill on demurrer, complainant appeals. Affirmed.

*Sharpe & Handy,* for complainant.

*Oren, Webster & More* and *George B. Holden,* City Attorney, for defendants.

HOOKER, C. J. The complainant, owning lands to the center of the Sault Ste. Marie river on both sides of a city street which extended to the water's edge, built docks

---

[1]Rehearing denied March 15, 1904.

extending some distance into the stream in front of his entire premises. No dock was built at the end of the street, but the city permitted him to deepen the water at that point by dredging, thereby making the slip formed by his docks navigable for some craft, which came to his docks. Being desirous of establishing ferry service at that point (and it is said to be the only available point for the purpose), it made a contract with a company, whereby it was authorized to build a dock at the end of the street, and, in consideration of an annual rental of $100, the city agreed to lease "all the exclusive riparian rights of the city at the foot of and abutting on Johnstone street for the period of five years;" said lease to provide: (1) For the construction of a suitable landing, and a two-story pavilion for the accommodation and comfort of passengers; (2) that lessee give and maintain a half-hour service between said dock and Canadian ports; (3) that lessee pay the expense of the construction, etc.; (4) fixing the price of transportation. Thereupon complainant filed the bill in this cause to restrain the execution of the lease and construction of the dock, and to prevent the lessee from taking exclusive possession of the premises. The cause was heard upon demurrer, which was sustained, and a decree was entered dismissing the bill. The complainant has appealed.

Complainant contends:

1. That the slip is a public highway, and has been used by boats in summer, and by persons for driving upon the ice when crossing the river in winter, for a long period. His counsel say that "it is possible that, if great public necessity demanded it, the city might construct a wharf on this property for the use of the public, but no such necessity is shown here;" and that public necessity demands the retention of the slip in connection with navigation, and that the public would be subjected to great inconvenience by the erection of this dock.

2. That docks built at the ends of streets are extensions of the streets, for the free passage of all citizens.

3. That a city council has no authority to lease a portion of a street for a private use.

4. That the lease implies authority to sublet such wharf and pavilion when erected.

That a city may build a dock at the end of a street has been held in many cases. *Barney* v. *Mayor and City of Baltimore*, 1 Hughes, 118 (Fed. Cas. No. 1,029); Angell, Highways, § 301; *City of Newport* v. *Taylor's Ex'rs*, 16 B. Mon. 804; *Mayor, etc., of New Orleans* v. *United States*, 10 Pet. 717; *McMurray* v. *Mayor, etc., of Baltimore*, 54 Md. 103; Gould, Waters, § 106; 2 Smith, Mun. Corp. § 1314; Dillon, Mun. Corp. (4th Ed.) §§ 110, 634 (note); *Newark Lime & Cement Manfg. Co.* v. *Mayor, etc., of Newark*, 15 N. J. Eq. 64.

The charter of the city (section 3, chap. 14, Act No. 533, Local Acts 1887) provides:

"The council shall have power to establish, construct, maintain, and control public wharves upon any lands or property belonging to or under the control of the shore or bank of said river within the city, not the property of individuals, to the extent to which the State can grant the same, and the council may lease wharfing and landing privileges upon any of the public wharves, docks, or landings, but not for a longer time than five years, and in such manner as to preserve the right of all persons to a free passage over the same with their baggage."

It is urged that this does not authorize the building of a wharf by private persons. When considered in connection with the power to lease wharfing and landing privileges, it would be unduly technical to say that the city must itself build the dock in the first instance, if it may build it at all, which this provision of the charter clearly authorizes. *Reighard* v. *Flinn*, 189 Pa. St. 355 (42 Atl. 23, 43 L. R. A. 502); *City of Corpus Christi* v. *Central Wharf & Warehouse Co.*, 8 Tex. Civ. App. 94 (27 S. W. 803); *Dugan* v. *Mayor, etc., of Baltimore*, 5 Gill & J., 374.

The complainant's counsel lay stress on an alleged right of their client to enter upon any dock that the city may build from his abutting dock, upon the apparent theory

that his docks are extensions of his lot, entitled to the same abuttal privileges upon the dock of the city that the lot proper has upon the highway. We may assume, for the purposes of this case, that this claim is valid, so far as it does not interfere with the city's right to use the dock for wharf purposes; but any such right is restricted to that extent. A city owning a wharf has a right to use it for the purposes of a wharf as other wharfs may be used, except that, at the end of streets, such wharves must be open to public use, as provided by the charter. This does not mean that wharfage cannot be charged for the use of the dock, or that the dock may not be used for loading and unloading and temporary storage of commodities, in accordance with the custom of using other wharves, and to such extent any general right of access and travel must yield. The city may regulate such wharves, and such regulations may be distinctive regulations, adapted to the use of wharves, rather than streets. See Dillon, Mun. Corp. (4th Ed.) §§ 109, 110, 575; *Horn* v. *People*, 26 Mich. 221; *Backus* v. *City of Detroit*, 49 Mich. 110 (13 N. W. 380, 43 Am. Rep. 447); *Scott* v. *Layng*, 59 Mich. 43 (26 N. W. 220, 791).

Much stress is laid upon the language of Mr. Justice COOLEY in *Backus* v. *City of Detroit*, in which he quotes the language in *People* v. *Lambier*, 5 Denio, 9 (47 Am. Dec. 273), where a landed proprietor claimed the riparian rights at the end of a street, and it was held that he could not, by filling up the land in front, obstruct the public right of passage from the land to the water, but that the street was extended by the *new-made land* to the water. Whatever we may think of the claim that the construction of a dock abutting the end of a street is an extension of the street, Mr. Justice COOLEY has not held that the use of such a dock can be hampered by the application of all of the incidents of an ordinary highway. In the case of *Horn* v. *People*, *supra*, written by Mr. Justice CAMPBELL, but concurred in by Mr. Justice COOLEY, it was said:

"The present charter authorizes the city to erect, repair, and regulate public wharves and docks at the ends of streets and on the property of the corporation, and to fix a line beyond which private docks shall not extend, and to lease the wharves and wharfing privileges at the ends of streets on the Detroit river, on such terms as they shall think fit, for not more than three years, subject to a free passage for persons with their baggage. This legislation indicates a clear intent on the part of the legislature not to treat these terminal wharves as highways, even when they belong to the city, but to leave their regulation within the city control, as far as it could be done without impairing private rights. * * *

"There is no instance in which the term 'public wharf' has been used in our legislation to indicate anything analogous to a dedication to any public use, like that of highways. Such a public right is unknown to the common law. Wharfage involves exclusive use, for longer or shorter periods, by each vessel, depending on the nature of its business and the extent of its cargo. All that is meant in the charter by a public wharf is a wharf belonging to the city, and to be used like any other wharf property. The term is applied as well to wharves on city property away from streets as to wharves at the end of streets. The city is not compelled to make them, and they have never been chargeable, like pavements, to adjacent property. They are built for purposes of revenue, and have always been used on that theory, as the law expressly allows them to be used. *They are not open to indiscriminate public use, like highways.*"

In *Backus* v. *City of Detroit, supra,* it is said:

"It is enough for us to say that the city derives its authority from the dedication of the public way, and that the construction of a wharf which shall give the means of access from the highway by land to the highway by water is not inconsistent with the gift."

The contention that water between the river bank and the channel is a highway is discussed in *Scott* v. *Layng, supra.* The court said:

"It is difficult to conceive upon what ground the decree was founded in the first place. It undertakes to establish a highway to the channel bank of the river, and treat the water between the land and the channel bank as an upland

highway.   The record shows a wharf or dock at the end of this avenue; and the point or slip wherein the stationary building stood, and where the floating house is moored, is upon the side of this dock.   It was plainly decided by this court in the case of *Horn* v. *People*, 26 Mich. 221, that a wharf at the termination of a street in the city of Detroit was not a part of the public highway, and that the city had authority to lease such wharf.   If the city has dominion over the wharves at the extremity of streets and in the water, *there is nothing to give adjacent landowners any more rights in such wharves than their neighbors have, which are none at all.*"

We think it unnecessary to go outside of Michigan for authority sustaining the right of the defendant city to build and lease wharfing privileges.   There are limitations on its power of exclusion of the public, but this lease is an attempt to let "all of the city's *exclusive* privileges," *not more*, and doubtless would be construed to transfer no more than the city had a right to part with.   Authorities are numerous that it cannot barter its police power; and whatever rights the public have it has not attempted to compromise, for it has only agreed to part with its exclusive rights.

We think there is no force in a claim of adverse possession, or the existence of a highway by user, in view of the allegations of the bill.

The decree is affirmed.

CARPENTER, GRANT, and MONTGOMERY, JJ., concurred. MOORE, J., did not sit.